Alexander Del Giorno, J.
These are four claims for the appropriation of claimants’ lands, two by Metzner and two by Armory Garage:
1. Claim No. 45797, Metzner. Pursuant to section 30 of the Highway Law, in a proceeding described as Interstate Route Connection 541-1-1, Interstate Route 502 to Interstate Route 540, Map 4, Parcel 4 = 4.388 acres.
2. Claim No. 45940, Metzner. Pursuant to sections 307 and 355 of the Education Law, Map 17, Parcel 1, for an addition to the State University Campus = 4.798 acres.
These two claims total 9.186 acres.
3. Claim No. 45798, Armory Garage. Pursuant to section 30 of the Highway Law, in a proceeding described as Interstate Route Connection 541-1-1, Interstate Route 502 to Interstate Route 540, Map 5, Parcel 5 = 0.94 acres.
4. Claim No. 45939, Armory Garage. Pursuant to sections 307 and 355 of the Education Law, Map 19, Section 1, for an addition to the State University Campus = 29.573 acres.
These two claims total 30.513 acres.
Lands in Claims Nos. 1 and 3 were appropriated June 17, 1965, and lands in Claims Nos. 2 and 4 were appropriated July 20,1965 by the filing of requisite maps in the office of the Clerk of the County of Albany. The parties stipulated, however, that interest in all claims shall be awarded from June 17, 1965.
The above appropriations comprised all of the claimants’ lands so that only direct damages are involved.
Both lands were vacant and unimproved, with brush and second growth trees thereon. The Metzner property was roughly triangular, with the base on the south side of Washing *605 ton Avenue. The Washington Avenue frontage was 739 feet; the westerly side extending southerly along the easterly boundary of Fuller Road was 986 feet long; the easterly line which ran parallel to the westerly line of the Armory Garage land extended southerly 911 feet and the southerly line of the truncated triangle connecting the easterly and westerly lines of the Metzner land was 183 feet long. The Fuller Road frontage, for 617 feet south of Washington Avenue was without access as a result of a previous State appropriation in 1961, while the remaining 369 feet had access on Fuller Road. The Armory Garage land was almost rectangular, with a frontage of 821 feet on Washington Avenue. It extended southerly to the rear some 1,700 feet.
All experts agreed, and the court fully concurs, that these lands are uniquely located in perhaps the best commercial area of Albany County. Although these lands were zoned residential, all the experts agreed that the highest and best use of the lands should be on a commercial basis, described as adaptable for such use as motel, office buildings, theatre, apartment buildings, bank, restaurant, gas station, meeting hall, etc.
It is well to explore here the probability of the change of zoning and time, effort and probable cost which might be required to achieve such change.
Mr. Andrew Vredenburgh, the State’s appraiser, states on pages 15 and 16 of his appraisal:

“ZONING

1 ‘ This property, for many years, has been zoned for residential use. The construction of the New York State Thruway in 1953 and the location of Interchange #24, 0.9 miles to the west of the subject property, and later the construction of the Northway and more recently the State Building Site Campus and the University Campus have produced environmental factors that tend to create a climate more conducive to commercial development than residential use.
“ The shift to a commercial potential results in strong pressure for changing the zoning from residential to commercial.
‘1 Precedent for such a change in the area has already been established by the rezoning in 1955 of what is now the Thruway Motel location. The reasonable probability of further zoning-changes has been recognized in decisions rendered by the courts in the following cases: (Albany Country Club v. The State of New York 37 misc. Second 134, Mod. 19 AD, Second 199, Affd. 13 New York, Second 1085); (City of Albany v. State of New
*606 York, 16 AD, Second 1-63) and (Joseph Mastroiene, et al v. State of New York, Claim No. 40009 and 42053).” and in State’s Exhibit C, p. 5 (Armory Garage), Mr. Vrendenburgh stated:

“APPRAISAL PROBLEM

“ The problem in preparing this appraisal .requires an estimated value for vacant land, zoned .residential, but, with definite commercial potential.
‘ ‘ There is every reason to believe that a change in zoning can be effected as indicated by court decisions and demonstrated by actual zoning changes made on other properties in the area. The properties affected by the court decisions are all located within the immediate vicinty of the subject property.”
Mr. Vrendenburgh’s opinion of the probable zoning change in both subject lands is representative of the opinions expressed by all the appraisers in their written appraisals as well as in their oral testimony.
The court agrees that these lands were in a unique neighborhood. To the east is the great campus or complex of State office buildings and the State University which has ambitious plans for expansion whereby, in a few years, there would be a working and living population of some 35,000. The campus and university lands surround the lands of claimants to the east and. .south. Directly across Washington Avenue, to the north, is the large, modern plant of the Mohawk Brush Company on 68 acres of land; to the north of that one finds an industrial complex and terminals served by the New York Central Railroad. East of the Mohawk plant one finds the Thruway Motel and Heilman Theatre.
Between Brevator Street or Crosstown Arterial, which is considered the easterly boundary of the State Campus, and Fuller Road which is defined as the westerly boundary of the above complex, the claimants’ lands are the only private lands available.
Claimants’ lands also are located midway between Central Avenue (Route 5) and Western Avenue (Route 20) which have long existed and are heavily traveled, with Fuller Road as the only connecting .road between those two routes. Fuller Road is an excellent road and is very heavily traveled.
Some 1,200 feet west of claimants’ lands are located Exit No. 24 of the New York State Thruway and the interchange of Washington Avenue and the Northway. Traffic from those interchanges going into Albany would pass along the south side of Washington Avenue in front of claimants’ lands.
*607 About one mile from this land one finds Sand Creek Road and the intersecting Wolf Road in the Town of Colonie. At the corner of Central Avenue and Wolf Road is the location of the 2,200-foot long shopping center of Macy’s and Sears. These are all important main highways. The area thereat is developing at a phenomenal rate, both commercially and industrially. It was testified that since about 1961 with the advent of the State Campus and 1963 when the Sears-Macy complex was established, the entire area thereabout has been affected in upward valuation, some more, some less, depending on location, usefulness and intentions of the purchasers.
This background of modern, in most cases, high-class developments in this area, erected on land most of which is at grade or nearly so, which land is nearly all sandy with good drainage, must be borne in mind when considering the value of the subject lands and the scarcity of other lands.
In this context, the court will discount from the final evaluation of these lands the probable expenses to be incurred for necessary cut and fill required to achieve an acceptable grade for development in accordance with the highest and best use as well as the reasonable expenses to be incurred to achieve a change in zoning.
The court has viewed and considered the comparable sales submitted, the location and topography of the subject parcels, the maximum use which could be made of the lands. The court viewed the subject lands once in the company of the interested parties, and on December 4, 1968, viewed the lands again by itself when it made a particular study of the topography.
The court finds that very few sales could be considered as comparable, but nevertheless praises the appraisers for submitting what sales they could find and their explanations that most sales were submittted to indicate the mercurial changes upward in market values, ever since the State Campus and University were established and the huge Sears-Macy shopping center was erected in 1963, along with the nearby Thruway and Northway.
While all the experts have agreed as to the best adoption of subject lands, the court finds claimants’ Exhibits 41, 42, 44 and 45 to be most helpful in mirroring the highest and best use attributed to the property by the experts. Claimants’ Exhibit 41, the Metzner claim, portrays a graphic representation of a probable complex of buildings which in claimants’ Exhibit 42 are described as three separate office buildings and a bank building. Claimants’ Exhibit 44, the Armory claim, portrays a shopping center, restaurant, motels, theatre, meeting *608 hall and apartment houses. Parking spaces are provided for the several buildings, although unrestricted parking is available within the whole complex.
Here it may be noted that between the two parcels there exists an easement to the Niagara Mohawk for its high tension power lines. Except for the easement, this area is not otherwise restricted.
Mr. Hoffman, an eminent civil engineer whose background is very extensive and who worked for the State of New York for many years as Assistant Engineer in Construction and Design and also in the Architectural Division, testified for the claimants regarding a projected grading of the land. He stated that he has built bridges, dams, airports, etc., and made thousands of surveys. He has had his own office since 1948. Referring to these lands, he testified that proper drainage for any development requires a grade not less than 1% nor greater than 8% with 5% as a very good grade. He studied cross sections of both lands and concluded that in Metzner there was required a cut of 37,400 cubic yards with a fill of 31,300 cubic yards by the use of tractor pans only, leaving a surplus of 6,100 cubic yards.
He stated that on the Armory land a cut of 154,150 cubic yards was required and that fill would take 159,000 cubic yards, thus using the Metzner surplus except for 1,250 cubic yards. The fill, he asserted, could be done by drag line without necessity of trucks. He gave no estimate of costs.
Mr. Czaban, also an experienced professional engineer, testifying for the State, in presenting his grading scheme provided for a grade between %% to 2%%. He conceded, however, that he had no specific scheme or theory of development in mind when he made his cross-sections and did not know what the highest and best use of the properties would be. His scheme would be a general scheme which he claimed to be adequate as to elevation and drainage. Adopting the cut and fill required by his scheme of development, he concluded that in Metzner he would remove 100,500 cubic yards at a cost of $78,375 and in Armory he would remove 340,000 cubic yards at a cost of $279,000.
On cross-examination Mr. Czaban stated that by his proposal he was not criticizing Mr. Hoffman’s proposal and that Mr. Hoffman’s scheme could have been used as well as his own. He conceded that how the subject properties would be developed would depend on the peculiar problems of the property and the desires of the developer.
*609 Upon the viewing of the claimants’ lands, the court was meticulous in observing heights and depths within both lands. It is satisfied that most of the cut (all sand) material could be used to fill depressions within the same land if the grades varied from 1% to some 8%. The court is of the opinion that if the final grades were from 1% to 5% — which would be a more ideal development as conceded by Mr. Hoffman himself — much more than 1,250 cubic yards of sand, but tremendously less than 440,500 cubic yards of sand, would have to be removed.
In arriving at its conclusions regarding the value of the lands as the State took them, the court will bear this problem in mind and will make allowance therefor in its final evaluations.
There arose at the trial a sharp difference of opinion among the experts as to how long it would take to rezone these lands. The court disregards the State appraiser’s conclusions that it would take two years to procure a zoning change for which he charges the lands 7% discounted rental value against his basic value of both lands. This may be a method which has attained some semblance of approval in the appraisal field, but in view of what has been occurring in the area of this appropriation it cannot be applied with any validity to the action herein.
The court is well satisfied that, considering the fact that only the State Campus and University grounds plus private owners of already commercially or industrially zoned properties are presently in the area affected, no objections would be raised against an application to change the zoning of the subject land, and that within two to three months on a perfunctory basis of mere time required to process the application, it would be granted. The legal and engineering fees projected by the claimants’ appraiser, which would be required for the application to change the zoning, would seem very generous — $10,000 for Metzner and $15,000 for Armory.
We should not forget that zoning boards are comprised of responsible citizens of substance, intelligence and experience. They know that the lands in question, when zoned commercial, would immediately rise in appraised valuation and thus add to the tax income of the community.
The court, therefore, in arriving at its final valuation figure, will consider the fact that a zoning change would be necessary. However, it will also bear in mind that such change was not only reasonably probable, but very likely available upon application therefor.
*610 Both at the trial and in its findings and brief, the State has taken a position that the court erred when it refused to permit the State to withdraw the appraisals made by Mr. Boulton, one of the State’s appraisers, which appraisals had been filed pursuant to our rule 25a of the Rules of the Court of Claims (22 NYCRR 1200.27). In this .regard the State may be reminded that, upon oral stipulation by the State and claimants at the beginning of the trial, all the filed appraisals, including Mr. Boulton’s, were marked in evidence. To the surprise of all, including the court, at the end of the testimony of the State’s other appraiser, Mr. Yredenburgh, the State moved to withdraw Mr. Boulton’s appraisal, even though Mr. Boulton had been present in court every day of the trial. The court refused this unusual request and advised the State that the appraisal was in evidence and could not be summarily withdrawn. The court advised the claimants’ attorney that he could call Mr. Boulton and examine him on his appraisal, which he did the following day.
In ruling as it did, this court was expressing its agreement with the recent case of Sullivan v. State of New York, decided by another Judge of this court on May 31, 1968 (57 Misc 2d 308, 309). The court therein held: “We further find that all appraisals filed under rule 25a of the Rules of the Court of Claims Act, whether made by the witness called to testify or by another appraiser totally unrelated to said witness, may be utilized by an adversary as an admission against interest relative to factual descriptive data, the before and after market value and the damage figures.”
Nevertheless, even though Mr. Boulton was called to the stand, the only testimony elicited from him was restricted to his opinion regarding the area, development of the area, and his opinion as to whether values had risen thereat since 1961. He was not questioned as to the valuations of the subject lands. Thus, his testimony fell far short of what the court believes to be the proper and permissible scope to which it might have been utilized. As a result, the court relied almost entirely upon the filed appraisal.
The State has cited cases: (Matter of City of New York [Gowanus Expressway], 21 N Y 2d 786; People ex rel. Kraushaar Bros. & Co. v. Thorpe, 296 N. Y. 223; Gnoj v. City of New York, 29 A D 2d 404) none of which has any bearing on the factual situation herein. Rule 25a was not a factor considered in any of these, and in the opinion of the court quite apart from the fact that the appraisal was an exhibit, the key in the determination of a question of this nature is the filing *611 of the appraisal. As was stated in Schade v. State of New York, (Claim No. 46353 [Dec. 13, 1967]): “ Once an appraisal is filed by either side and thereby adopted by that party he cannot object to its being received in evidence at least as an admission against interest, notwithstanding the fact that the filing of a subsequent appraisal is permitted by Court Order.”
The court has passed upon the findings submitted by both sides, and those findings are to be considered as an extension of this Memorandum-Decision in accordance with the manner in which the court found.
The court considers necessary for the proper understanding of this Memorandum-Decision a concise analysis of the comparable sales submitted, especially those to which greater weight of comparability was attributed. Since Mr. Murphy and Mr. Boulton were adjunct appraisers, Mr. Murphy for Mr. Robert and Mr. Boulton for Mr. Vredenburgh, the court will refer specifically to the testimony and appraisals of Mr. Robert and Mr. Vredenburgh, the main appraisers, without discounting the appraisals and testimony of Mr. Murphy or Mr. Boulton in its final conclusion. The .State contends that claimants’ appraiser Robert has valued the subject lands as if already zoned commercial. The court disregards this contention for its lack of applicability to the facts. In his appraisal, Mr. Robert states at the outset: “Zoning: The present zoning is residential. The developed facts have created, over the past few years, an environment conducive only to commercial use for subject property. A precedent for such a zoning change in this neighborhood has already been established. The future zoning change is a fact as indicated in the decision by the courts. ’ ’ Thus, although both the written appraisal and Mr. Robert’s testimony were based on his consideration of the highest and best use of the lands as commercial, he was fully cognizant of the fact that they were presently zoned residential. Accordingly, he made allowances for the cost of procuring a change of zoning from residential to commercial use. In the analysis .of comparable land leases which actually offer the best approach to values in this case, we find that he and the State’s appraiser have adopted the same leases to arrive at acre unit values. The State’s leases (Metzner) 6, 7, 8, 9 and 11 are the same as claimants’ leases 37, 35, 36, 39 and 38.
The State’s appraiser stated that he gave most weight to his Sale No. 4 and Lease No. 8. He said Sale No. 4 was more nearly comparable to the Metzner claim.
Sale No. 4 comprised 3.33 acres of land in a business-residential area on the west side of Wolf Road, 800 feet north of Central *612 Avenue opposite the Sears-Macy shopping center. This sold in August 1965 for $42,000 an acre. He adjusted the price 5% for location, which indicated $44,100 per acre for the Metzner parcel.
This parcel sloped up to five feet from the building line and was later granted a variance to commercial.
He presented but did not emphasize that Sale No. 5, also on the west side of Wolf Road and 1,000 feet north of Central Avenue which involved two plots purchased between September and November 1965 sold for $52,600 per acre for 4.275 acres, which with the same adjustment of 5% made the Metzner property worth $55,200 per acre. That parcel was zoned “ business.”
Lease No. 8 contained 9.4 acres. It was leased by Howard Johnson on May 20, 1958. The topography was uneven, but it was adapted to the motel and restaurant the lessee built. It is by Route 9W, near Exit 23 of the Thruway. From the Thruway, however, it is necessary to use a roundabout approach to reach it.
Mr. Vredenburgh gave considerable weight to this land. To its present value of $45,000 per acre he added 10% for location, thus making Metzner’s per acre value $49,500.
Across from the State Campus on the north side of Washington Avenue we find the Thruway Motel. This is about one-half mile east of the Metzner land. The original lease was made in 1956. As of 1965, Mr. Vredenburgh gave it an acreage value of $52,679 which, with a 5% adjustment for location, indicates an acre value for Metzner of $55,300. All his sales had a range of low $38,800 and high $55,300. He gave a value to the Metzner claim of $368,000 or $40,000 per acre. Mr. Boulton’s value was $360,000.
The values, descriptions and opinions given in Metzner were generally adopted by the appraisers in the Armory Garage claims. Mr. Vredenburgh, in Armory, added Sale No. 6, Latham Enterprises, Inc., to Fre-Mar Properties, Inc., July 3, 1963. It contained 27 acres on the east side of Route 9 (New Loudon Road) and south of Cobee Road.
He also added Sale No. 12. It contained 2.089 acres on the west side of California Avenue, a dead end street, about 260 feet north of Central Avenue and some one mile north of subject land. He found that the Latham sale was not as good as subject. This sale had a large drainage ditch running through it and.also sloped backwards from New Loudon Road. It may be noted that it took some two years to eliminate the drainage ditch. The Latham sale was $14,200- per acre, and adjusting it *613 for time and location (but not for topography) brought the Armory land value to $42,200. As to the California Avenue sale (Sale No. 12), he stated that that sale included expenses of zoning and utilities on the part of the grantee. He analyzed that sale at $47,870 per acre. He conceded the subject land was in a better location and accordingly adjusted 10% upward to $52,600 per acre for the subject land.
On the basis of his analysis, Mr. Vredenburgh concluded that the Armory land was worth $49,700 per acre or $1,462,000. (The multiplication of the figures indicates $1,516,000.) Thereafter he deducted $279,000 for the requisite earthwork and the two years he estimated as necessary for the proposed rezoning application, thereby arriving at a final value of $1,033,000 or $33,900 per acre.
Mr. Robert’s Sale No. 1 was also the Latham Enterprises sale. He stated this sale was 7 miles from subject, was comparable to subject only in size. He referred to this sale only to show the market trends in values and the use of topography. He asserted it would require too great an adjustment for location, time and topography to be of any comparable value.
He also used (Sale No. 5) the California Apartments sale to indicate market values in the Central Avenue-Wolf Road area. The sales in the area, Sales 2, 3, 4, 5, 6, 22, 35, 40 and 42, occuring between 1960 and 1965, indicated a law acreage value from $23,500 to a high of $166,000 and, adjusted to the subject on a time factor, indicated a value of subject between $50,000 and $122,666.
Mr. Robert stated that the subject location is slightly better than the above sales area.
The court has analyzed and reanalyzed the eight appraisals submitted. The court viewed the subject properties for the second time in order to better understand the appraisals and the reasons advanced concerning the comparable sales and topography of the land.
Again the court concludes that the subject lands are unique. Their location is, perhaps, the most fortuitous of any vacant lands in Albany County. Whether from the Thruway or the Northway, one traveling to Albany must pass immediately in front of these lands. In 1959, 5,675 vehicles passed daily on the side of this property on Washington Avenue. In 1964, 20,291 vehicles passed daily on the same side. Vehicular traffic has been increasing in the area by leaps and bounds.
It is the court’s opinion that the Latham Enterprises lands (Route 9) do not compare except in acreage. There existed there a large drainage ditch through the land which had to be *614 relocated. The land was a “ bowl”, facing on New Loudon Road but flanked by a town road known as Cobee Road. The court believes no sensible comparison can be made between Latham and subject lands with respect to location, time or topography. Nor does it see a true -comparison between the California Apartments and the subject lands, either in size, location or advantage of composite uses. California is off the beaten track, although excellent for the usual quiet sought after for an apartment house. The subject not only would support an apartment house complex but also motels, restaurants, a theatre, a shopping center, a bank and the like.
The Thruway Motel, as excellent as it is, nevertheless has frontage only on Washington Avenue, whereas the Armory land also fronts on Fuller Road, and is on the north side of Washington Avenue, the far side of the street for traffic coming from the Thruway and Northway. Accordingly, the court considers the subject land superior. As of 1962, when the lease was redrawn on the basis of 253 units, the value of the motel acreage was placed at $53,756 per acre. Values of land in this whole area have increased considerably between 1962 and 1965. Mr. Robert asserted that in 1965 the same acreage had a value of $134,390 per acre.
The Schrafft’s Motel, abutting Route 9W, near Exit 23 of the Thruway, was leased in 1962 for $20,700 per year plus overage. This rent averages out at $44,300 per acre. The grade here is an undulating one, a portion of the property being at grade while other sections are either above grade or below grade. It is out of the way for Thruway traffic, but is well located on 9W. Further, seven -acres of the 13.58 -acres are not usable, being in the form of a ravine. The subject is much superior in location, topography and access to vehicular traffic. Adjusting its value to 1965, Mr. Robert gave an acre value to subject land of $110,750.
As stated above, the court praises the experts for the great amount of work they put into these cases in an effort to find comparable sales, and they presented to the court a large number of sales which indicate the sharp rise in market values of land since the Campus, State University and the Sears-Macy complex came into being.
The court will be aware of these factors, supported by its own viewings, when it determines the values of the land in both claims. The court believes that in both claims the better approach is the basic overall acre unit value. In each case the court sees the land as a purchaser would — the whole parcel —and assumes a highest and best use to be for integrated *615 development purposes. As would a willing buyer in the market, the court would say to itself: I will pay so much per acre, considering that I will also have to do a considerable, but not massive cut and fill job and have to procure a zoning change in order to place thereon those structures which will develop the lands to their highest and best use.
The court finds that in Metzner the claimants are entitled for the appropriation of 9.186 acres to the sum of $624,648, rounded to $625,000, at $68,000 per acre, or $1.56 a square foot, and, in Armory Garage, the claimant is entitled for the appropriation of 30.513 acres to the sum of $1,769,754, rounded to $1,769,750, at $58,000 per acre, or $1.33 a square foot.
The difference in acre value the court found is due to the more favorable and sensitive location of the Metzner land, including the corner influence.